1  Stephen R. Smerek (SBN: 208343)
   ssmerek@winston.com
2  **WINSTON & STRAWN LLP**
   333 S. Grand Avenue
3  Los Angeles, CA 90071-1543
   Telephone:  (213) 615-1735
4  Facsimile:  (213) 615-1750

5  George C. Lombardi (admitted *pro hac vice*)
   glombardi@winston.com
6  **WINSTON & STRAWN LLP**
   35 W. Wacker Drive
7  Chicago, IL 60601
   Telephone: (312) 558-5600
8  Facsimile: (312) 558-5700

9  John J. Rosenthal (admitted *pro hac vice*)
   jrosenthal@winston.com
10 Adam S. Nadelhaft (admitted *pro hac vice*)
   anadelhaft@winston.com
11 **WINSTON & STRAWN LLP**
   1700 K Street, N.W.
12 Washington, DC 20006-3817
   Telephone: (202) 282-5785
13 Facsimile:  (202) 282-5100

14 *Attorneys for Defendant*
   MONSANTO COMPANY

15

16                **UNITED STATES DISTRICT COURT**

17               **CENTRAL DISTRICT OF CALIFORNIA**

18

19

20 ELISABETH MARTIN, on behalf of          **Case No. 5:16-cv-02168-JFW (SPx)**
   herself, all others similarly situated,
21 and the general public,                  **DEFENDANT MONSANTO**
                                            **COMPANY'S OPPOSITION TO**
22              Plaintiff,                   **PLAINTIFF'S MOTION FOR CLASS**
                                            **CERTIFICATION**
23          v.
                                            **REDACTED FOR PUBLIC FILING**
24 MONSANTO COMPANY,

25              Defendant.                   Date:     March 13, 2017
                                            Time:     1:30 p.m.
26                                           Judge:    Hon. John F. Walter

27

28

# **TABLE OF CONTENTS**

Table of Authorities ..................................................................................................ii

Introduction ............................................................................................................1

Legal Standard ......................................................................................................6

Argument ...............................................................................................................7

   I.     Plaintiff Has Failed to Satisfy the Requirements of Rule 23(a) ........................7

     A.   Plaintiff Cannot Establish Numerosity ..........................................................7

     B.   Plaintiff Cannot Establish Commonality ......................................................8

     C.   Plaintiff Cannot Establish Typicality ............................................................8

        1.  Plaintiff's Conduct in Purchasing and Using Super Concentrate is Subject to Unique Defenses ....................................................................................8

        2.  Plaintiff Has No Standing to Bring Claims for Products She Did Not Purchase ....................................................................................................9

     D.   Plaintiff Is An Inadequate Class Representative .........................................11

   II.    Plaintiff Has Failed to Meet The Requirements of Rule 23(B)(3) ..................14

     A.   Individualized Inquiries of Materiality and Reliance Predominate.............14

     B.   Damages Are Not Capable of Measurement on a Classwide Basis ...........20

        1.  Plaintiff Wrongly Conflates "Benefit-of-the-Bargain" with Out-of-Pocket Losses...................................................................................................20

        2.  Weir's Benefit-Of-The Bargain Model And Calculations Are Fatally Flawed....................................................................................................22

     C.   A Class Action is Not Superior to Other Available Methods for the Fair and Efficient Adjudication of the Dispute...............................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Algarin v. Maybelline, LLC*,
   300 F.R.D. 444, 459 (S.D. Cal. 2014) ............................................................. 15, 19

*Astiana v. Ben & Jerry's Homemade, Inc.*,
   2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ....................................................... 20, 24

*Astiana v. Kashi Co.*,
   291 F.R.D. 493 (S.D. Cal. 2013) ............................................................................ 15

*In re Brazilian Blowout Litig.*,
   2011 WL 10962891 (C.D. Cal. Apr. 12, 2011) (Walter, J.) .................................... 7

*Brown v. Hain Celestial Grp., Inc.*,
   2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ...................................................... 10

*Caldera v. J.M. Smucker Co.*,
   2014 WL 1477400 (C.D. Cal. Apr. 15, 2014) ...................................................... 22

*Christiansen v. Roddy*,
   186 Cal. App. 3d 780 (1986) ................................................................................. 21

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) .......................................................................................... 20

*Diacakis v. Comcast Corp.*,
   2013 WL 1878921 (N.D. Cal. May 3, 2013) ...................................................... 7, 23

*Eike v. Allergan, Inc.*,
   2016 WL 4272127 (S.D. Ill. 2016) ....................................................................... 23

*Faistl v. Energy Plus Holdings, LLC*,
   2012 WL 3835815 (D.N.J. Sept. 4, 2012) ............................................................ 18

*In re Ferrero Litig.*,
   794 F. Supp. 2d 1107 (S.D. Cal. 2011) ................................................................... 9

*Gonzalez v. Proctor and Gamble Co.*,
   247 F.R.D. 616 (S.D. Cal. 2007) ........................................................................... 11

*In re Hain Celestial Seasonings Prod. Consumer Litig.*,
  2015 WL 12001273 (C.D. Cal. Sept. 23, 2015) ........................................ 16

*Hanlon v. Chrysler Corp.*,
  150 F.3d. 1011 (9th Cir. 1998) ............................................................... 11

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ............................................................... 6, 8

*Hendricks v. Starkist Co.*,
  2016 WL 5462423 (N.D. Cal. Sept. 29, 2016) ........................................ 23

*Hodes v. Van's Int'l Foods*,
  2009 WL 2424214 (C.D. Cal. July 23, 2009) ..................................... 16, 20

*Hurley v. U.S. Healthworks Medical Grp. of Wash., P.S.*,
  No. 05–017–EFS, 2006 WL 1788994 (E.D. Wash. June 27, 2006) ..................... 25

*Johnson v. Harley–Davidson Motor Co. Grp.*,
  LLC, 285 F.R.D. 573 (E.D. Cal. 2012) ................................................... 15

*Jones v. ConAgra Foods, Inc.*,
  2014 WL 2702726 ........................................................................... 15, 23

*Jovel v. Boiron, Inc.*,
  2014 WL 1027874 (C.D. Cal. Feb. 27, 2014) .......................................... 12

*Lanovaz v. Twinings N. Am., Inc.*,
  2014 WL 1652338 (N.D. Cal. Apr. 24, 2014) ......................................... 22

*Lilly v. Jamba Juice Co.*,
  308 F.R.D. 231 (N.D. Cal. 2014) .......................................................... 10

*Major v. Ocean Spray Cranberries, Inc.*,
  2013 WL 2558125 (N.D. Cal. Jun. 10, 2013) ......................................... 11

*Maloney v. Verizon Internet Servs., Inc.*,
  413 F. App'x 997 ............................................................................... 18

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................... 17

*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,
  2015 WL 4537957 (N.D. Cal. July 27, 2015) ......................................... 18

iii

*Minkler v. Kramer Labs., Inc.*,
  2013 WL 3185552 (C.D. Cal. Mar. 1, 2013) (Walter, J.) ...................... 9, 14, 15, 20

*Moheb v. Nutramax Labs. Inc.*,
  2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) (Walter, J) .................................... 6, 18

*Nghiem v. Dick's Sporting Goods, Inc.*,
  2016 WL 8202696 (C.D. Cal. Dec. 1, 2016) ........................................................... 12

*In re NJOY, Inc. Consumer Class Action Litig.*,
  2016 WL 787415 (C.D. Cal. Feb. 2, 2016) ...................................................... 22, 24

*Pfizer Inc. v. Superior Court*,
  182 Cal. App. 4th 622 (2010) ................................................................................ 16

*Philips v. Ford Motor Co.*,
  2016 WL 7428810 (N.D. Cal. Dec. 22, 2016) ....................................................... 23

*In re POM Wonderful LLC*,
  2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ....................................................... 23

*Sanchez v. Wal Mart Stores, Inc.*,
  2009 WL 1514435 (E.D. Cal. May 28, 2009) ........................................................ 16

*Siles v. ILGWU Nat'l Ret. Fund*,
  783 F.2d 923 (9th Cir. 1986) ................................................................................... 7

*Sonner v. Schwabe N.A., Inc.*,
  2017 WL 474106 (C.D. Ca. Feb. 2, 2017) ............................................................. 16

*Todd v. Tempur-Sealy Int'l., Inc.*,
  2016 WL 5746364 (N.D. Cal. Sept. 30, 2016) ...................................................... 10

*Turcios v. Carma Labs., Inc.*,
  296 F.R.D. 638 (C.D. Cal. 2014) ............................................................... 11, 18, 24

*Vaccarino v. Midland Nat. Life Ins. Co.*,
  2014 WL 572365 (C.D. Cal. Feb. 3, 2014) ...................................................... 20, 21

*Vinole v. Countrywide Home Loans*,
  246 F.R.D. 637 (S.D. Cal. 2007) .............................................................................. 7

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................... 1, , 6, 7, 8

*Waller v. Hewlett-Packard Co.*,
   295 F.R.D. 472 (S.D. Cal. 2013) ............................................................ 12

*Webb v. Carter's Inc.*,
   272 F.R.D. 489 (C.D. Cal. 2011)...................................................... 15, 25

*Weidenhamer v. Expedia, Inc.*,
   2015 WL 7157282 (W.D. Wash. Nov. 13, 2015).................................... 13

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   268 F.R.D. 604 (N.D. Cal. 2010) .............................................................. 7

*Wiener v. Dannon Co., Inc.*,
   255 F.R.D. 658 (C.D. Cal. 2009)............................................................ 11

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001), *as amended*, 273 F.3d 1266 (9th Cir.
   2001) ........................................................................................... 6, 14, 20

**Statutes**

Cal. Civ. Code § 3343(a) .............................................................................. 20

**Other Authorities**

Rule 23(a)........................................................................................... 6, 7, 11

Rule 23(a)(3)................................................................................................ 11

Rule 23(b)(3)......................................................................... 6, 7, 14, 19, 20

## **INTRODUCTION**

Contrary to Plaintiff's assertion, this is not a straightforward warranty and consumer fraud case that is susceptible to class treatment. This case is about a unique consumer who does not understand that the terms "makes up to" and "makes" indicate different things. On bottles of concentrated herbicide products, specifically Roundup Weed & Grass Killer Super Concentrate ("Super Concentrate") and Roundup Weed & Grass Killer Concentrate Plus ("Concentrate Plus"), a neck label states the product "Makes Up to X Gallons." Then, in clear and unambiguous mixing instructions attached to the product, two concentration levels are offered depending on the type of weeds the consumer wants to kill. Plaintiff admits that she read these instructions, except for the last line, and Plaintiff admits that the product does "Make Up to X Gallons" when mixed according to the lower concentration level. Like any concentrate—from Kool-Aid to Pine Sol to Super Concentrate—the amount the product ultimately makes is predicated on how the individual consumer mixes the concentrate with water. That fact alone makes this case inappropriate for class treatment as to liability and/or damages.

Many other unique facts separately preclude such treatment on several independent grounds. For any of these reasons, Plaintiff's motion for class certification should be denied:

**Plaintiff Has Not Satisfied the Numerosity Requirement**. Plaintiff states "51,000" California consumers purchased the product with the neck label. Dkt. 51-1 at 1. The fact that consumers may have seen the neck label does not, however, satisfy Plaintiff's burden to demonstrate numerosity.

**Plaintiff Cannot Demonstrate That There Are Common Questions of Economic Injury, Reliance, or Materiality Amongst the Purchasers of Roundup Concentrates ("Concentrates").** "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011). Here, the very nature of a concentrated product

mixed by individual consumers along with the nature of the "Makes Up to X Gallons" statement drive dissimilarities across every legal and factual issue raised in Plaintiff's warranty and consumer fraud claims.

**Plaintiff Is Not the Typical Consumer of Super Concentrate and Concentrate Plus**. Plaintiff's "claims and defenses" are hardly typical of other class members, as her purchasing experience differs from other class members. Unlike many concentrate users, Plaintiff had no prior experience with concentrates, did no research, asked no questions, and concedes that she did not read all the directions before purchase or use. Further, Plaintiff attempts to represent a class of both Super Concentrate and Concentrate Plus users. It is undisputed, however, that Plaintiff never purchased or used Concentrate Plus, a product that has: (i) differing active ingredients; (ii) differing use purposes; (iii) differing concentration levels; and (iv) differing consumers. In fact, Plaintiff bought Super Concentrate to use in her first-time vegetable garden—a use for which Concentrate Plus is not appropriate. *See* Ex. 2 at MM5029 ("While Roundup [Concentrate Plus] may be used to prepare a vegetable garden for planting. DO NOT USE for spot weed treatment after planting fruits or vegetables.").

**Plaintiff Is Not an Adequate Class Representative**. Plaintiff seeks less damages than other purported class members, who could receive a full refund. She also cannot represent those users who purchased the product for use at the lower concentration level and made the maximum amount of solution. In addition, Plaintiff also has serious credibility issues going to the heart of the class claims, providing at best conflicting testimony as to how she used the product.

**Common Questions of Law and Fact Do Not Predominate Across All Putative Class Members as to Liability on the Breach of Warranty and Consumer Fraud Claims**. Plaintiff has not established, as a matter of law or fact, that the "Makes Up to X Gallons" statement is material. It is clear that Plaintiff carries the burden to demonstrate, through common proof, materiality and reliance as to both the warranty

and consumer fraud claims. Yet, Plaintiff offers no means (expert or otherwise) to establish such proof on a classwide basis.

**Facts of Damage and the Amount of Damages Cannot be Computed on a Classwide Basis**. Plaintiff offers an expert to opine that damages can be established on a classwide basis by a "one-size-fits-all" approach of multiplying the unit sales by average retail price by the amount the bottle was "under filled." This methodology is legally and economically flawed, as economist Dr. Robin Cantor explained: "Weir's entire analysis rests on a monolithic view of consumers that is not supported by the available evidence on the attitudes, habits, and practices of concentrate users or available pricing data in periods where Roundup Products were sold without the Up to Claim." Cantor Decl. ¶ 20. Plaintiff's claim also suffers from a total failure of proof to offer a reliable method to measure damages relating to the consumer fraud claims.

## FACTS

Despite attempting to mischaracterize this as an "under-fill case," Plaintiff admits that the physical bottle Monsanto sells actually contains the amount of concentrated fluid stated on the label. Ex.[1] 45 at 131:22–25. Plaintiff's sole focus in this case is the neck label that states "Makes Up to X Gallons." Plaintiff concedes that the directions for use provide two dilution levels, and that the statement "Makes Up to X Gallons" is true when a consumer adds the amount of concentrate to water at the lower concentration level, for "easy to kill weeds." Dkt. 19 ¶¶ 26–27; Ex. 45 at 141:24–142:1. Therefore, there is no dispute that the label includes mixing instructions that meet the "Makes Up to X Gallons" statement. She alleges, however, that the "Makes Up to X Gallons" statement misleads consumers because the statement leads consumers to believe the product "Makes X Gallons," even though that is not what the label states.

---

[1] All "Ex." references are to the Smerek Declaration. And for ease of reference, Monsanto follows the convention set by Plaintiff where Monsanto's document prefix, "Mon-Martin" becomes "MM." Also, leading zeros are dropped.

3

1
2
3
4
5
6

Super Concentrate and Concentrate Plus have been in the market since the early 2000s. Exs. 3, 18; Guard Decl. ¶¶ 16–18, 21–23. The "Makes Up to X Gallons" statement was originally added to the master labels and ***approved*** by the EPA (i.e., satisfying the misbranding requirement) for both products in 2000 and 2001, and has appeared on the EPA-approved pamphlet since that time. Exs. 5–15, 20–28; Guard Decl. ¶¶ 17, 22.

7
8
9
10
11
12
13
14
15
16
17

Sometime after January 2, 2013, Monsanto added the "Makes Up to X Gallons" claim to the neck label. Guard Decl. ¶¶ 28, 35. The decision to add that statement to the neck label had nothing to do with misleading consumers, as Plaintiff's Motion suggests, but rather was made in response to a request from Home Depot, which wanted customers to be able to compare the Concentrates against its own store brand that made more maximum gallons per container. *Id*. ¶ 53; *see also* Ex. 30 at MM4394.[2] While Monsanto agreed to add the neck label knowing that Concentrates made less total gallons than other brands, it also knew that Concentrates are purchased by consumers for many reasons unrelated to total gallons. Guard Decl. ¶ 48. Plaintiff, in fact, admitted to purchasing Super Concentrate, in part, because of the Roundup brand name. Ex. 45 at 122:4–11.[3]

18
19
20
21
22
23

Plaintiff's assertion that Monsanto "chose" to mislead customers by not explaining the dilution levels on the front and back panel lacks any factual support. Dkt. 51-1 at 2. Consumers know that Super Concentrate and Concentrate Plus products need to be mixed with water. Guard Decl. ¶ 7. Unlike many users of Monsanto's Roundup Ready-to-Use products, purchasers of Concentrates are sophisticated users of Roundup,

24
25
26
27
28

[2] Use of such "up to" statements are common in the industry and, by way of example, Roundup's primary competitor—Spectracide—also states "Makes Up to X Gallons" on the necks of its labels.  Guard Decl. ¶ 52.

[3] Plaintiff disingenuously suggests that Monsanto somehow knew that that the neck label was misleading by taking out of context a reference to a competitor advertisement that has nothing to do with the statement at issue here. *See* Dkt. 51-1 at 2 n.2.

4

who "████████████████████." *Id.*¶ 47; Ex. 40 at MM3861. These consumers understand that the Concentrate products can be used at different dilution levels, including the lower dilution level.[4]

Plaintiff's action is based upon her own individual understanding of the label "Makes **_up to_** X Gallons," and her own cursory conclusion that it does not mean what it says, but rather means "Makes X Gallons." Ex. 45 at 139:5–8.[5] Under her view, a consumer could only use the product at one concentration level. *Id.*[6] But in fact, Monsanto provides explicit "Directions for Use" and "Mixing Instructions" in the pamphlet that is part of the rear label, which are reviewed and approved by the EPA and which describe how to mix the product at **two** different concentration levels. Ex. 1 at MM9728; Guard Decl. ¶¶ 29–30, 37–38.

Plaintiff admits that out of five lines of mixing instructions, she read the first four lines in 2014, but happened to skip the fifth and final line, which explained the lower concentration level for "easy to kill plants and seedlings." Ex. 45 at 130:7–13, 135:1–23, 154:6–156:9.[7] Plaintiff's experience is inconsistent with most Concentrate users

---

[4] *See id.* Ex. 34 at Martin 21 ("This version of Roundup—the concentrate—is very versatile as it can be mixed with any strength for any purpose. I use it to kill autumn olive which takes a concentrated dose. And I use it to kill minor weeds at a much less concentrated dose.").

[5] *See also* Ex. 45 at 138:22–139:15 ("Q: [I]t says it 'makes up to 23 gallons', you see that? A. Yes, I do. Q: It doesn't say it makes 23 gallons, does it?  A. No, it does not? . . . Q: What do the words 'up to' mean to you? A: It means it makes 23 gallons. When the weather man tells me it's going to be up to 72 degrees, it's going to be 72 degrees. Q: You don't understand that [it] could be somewhere below 72 degrees? A:  Possibly, but I expect I—it says 23 gallons, I want 23 gallons.").

[6] Yet, Plaintiff admitted that she mixed Super Concentrate at differing levels, opting for a lower concentration level on the second application. *Id*. at 89:14–16 ("Q. So you're using a lower concentration level for the second burn-down. A. Yes.").

[7] Plaintiff also testified that when she purchased Super Concentrate, she reviewed the wheel on the back of the bottle. *Id*. at 129:2–11. The wheel includes instructions to add "2½ fl oz [of Super Concentrate] Per Gallon of Water." Ex. 1 at MM9727. Simple math would have revealed to Plaintiff that using 2½ fl oz would only yield about 14 gallons,

5

1  who read and understood the mixing directions. *See, e.g.*, Ex. 38[8]

2  Interestingly, Plaintiff herself purchased Super Concentrate for three years

3  without expressing any concern. Ex. 45 at 27:11–14, 53:9–19, 78:22–80:24. In fact, she

4  admitted that she would have bought Super Concentrate again in 2017 if Plaintiff's

5  counsel had not reached out to her. *Id*. 147:4–6. In other words, Plaintiff did not have a

6  problem with Super Concentrate until Plaintiff's counsel suggested she did. *See* Ex. 45

7  at 54:17–59:9; *see also* Exs. 41 and 42.

8  ## LEGAL STANDARD

9  A party seeking class certification bears the heavy burden of demonstrating that

10  a case meets all the requirements of Rule 23, which governs class actions. *Zinser v.*

11  *Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *as amended*, 273 F.3d

12  1266 (9th Cir. 2001). This includes bearing the burden of demonstrating the four

13  requirements of Rule 23(a): "(1) numerosity of plaintiffs; (2) common questions of law

14  or fact predominate; (3) the named plaintiff's claims and defenses are typical; and (4)

15  the named plaintiff can adequately protect the interests of the class." *Hanon v.*

16  *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). If the Rule 23(a) prerequisites

17  are met, the Court must then decide if certification is appropriate under Rule 23(b).

18  *Moheb v. Nutramax Labs. Inc.*, 2012 WL 6951904, at *2 (C.D. Cal. Sept. 4, 2012)

19  (Walter, J). "Rule 23 does not set forth a mere pleading standard. A party seeking class

20  certification must affirmatively demonstrate his compliance with the Rule." *Dukes*, 564

21

22

23  rather than the 23 gallons stated on the neck label. ████████████████████

24  Ex. 40 at MM3887.

25  [8] As Plaintiff admits, "it's important to read the instructions for a herbicide before you
use it." Ex. 45 at 134:10–135:23; *see also id*. at 115:12–18 ("Q: Did you read the

26  instructions before you used it? A: ***Yes***. Q: Why? A. ***Because they're there for a***

27  ***reason***? Q: What reason's that? A: ***To inform me on how to use the product***."
(emphasis added)). Plaintiff does not "have any idea" how other consumers understand

28  the label or how they use Concentrate products. *Id*. at 167:20–173:17.

1    U.S. at 350 (2011) (also stating that plaintiff must provide "significant proof").

2    Additionally, a court must perform its own "rigorous analysis [to ensure] that the

3    prerequisites" of Rule 23 have been met. *Id*. at 350–51.

## ARGUMENT

### I. PLAINTIFF HAS FAILED TO SATISFY THE REQUIREMENTS OF RULE 23(A)

#### A. Plaintiff Cannot Establish Numerosity

8        Plaintiff glosses over the numerosity requirement, only stating that "hundreds of

9    thousands of units" were sold to "at least tens of thousands of consumers." Dkt. 51-1 at

10   9. But merely stating the number of purchases does not demonstrate numerosity.

11   Plaintiff must show that there is a sufficient number of consumers who were actually

12   misled by Monsanto's labels.[9] For example, consumers who read the whole label and

13   understood the two dilution rates are uninjured and cannot be part of the proposed class.

14   *See, e.g.*, *Vinole v. Countrywide Home Loans*, 246 F.R.D. 637, 641 (S.D. Cal. 2007)

15   (declining to certify class where definition did not exclude individuals who admittedly

16   had no claim); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604,

17   612 (N.D. Cal. 2010) (a class is overbroad if it includes both injured and uninjured

18   products).[10]

---

20   [9] *See, e.g.*, *Diacakis v. Comcast Corp.*, 2013 WL 1878921, *5 (N.D. Cal. May 3, 2013)

21   ("Plaintiff offers no evidence regarding the number of those subscribers who were

22   allegedly misled by Comcast into believing there would be no modem-related fees if

23   they signed up for the Triple Play package. The mere fact that there are numerous Triple

     Play subscribers, standing alone, is insufficient to show numerosity."); *Siles v. ILGWU*

24   *Nat'l Ret. Fund*, 783 F.2d 923, 930 (9th Cir. 1986) (affirming numerosity factor not

25   satisfied where only the number of overall plan members was presented, and not how

     many were denied certain benefits).

26   [10] The only case law Plaintiff cites, *In re Brazilian Blowout Litig.*, 2011 WL 10962891

27   (C.D. Cal. Apr. 12, 2011) (Walter, J.) is inapplicable here. There, all consumers who

     purchased the product were deceived because of affirmative representations that the

28   product contained no formaldehyde, when it fact it did. *Id.* at *2. Here, however,

     Plaintiff admits the affirmative representation of "Makes Up to X Gallons" is true; thus

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.     Plaintiff Cannot Establish Commonality**

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. . . . Their claims must depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 349–50.[11] Plaintiff cannot demonstrate that there are common questions of economic injury, reliance, or materiality amongst purchasers of the Concentrates (these points are explained later, under a predominance analysis).[12]

**C.     Plaintiff Cannot Establish Typicality**

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508. Additionally, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Id.*

**1.     Plaintiff's Conduct in Purchasing and Using Super Concentrate is Subject to Unique Defenses**

Because Plaintiff did not read the entire label, she differs substantially from other

---

only those consumers that used the Concentrates at a certain level and were actually mislead by the label could be part of the class.

[11] "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 349–50.

[12] Because the facts and analyses applicable to commonality also bear on predominance, similar arguments with more detail are grouped below, within that section, II.A. *See Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 459 (S.D. Cal. 2014) ("The Courts analysis with regards to commonality under Rule 23(a) is fully applicable in the analysis of predominance.").

purported members of the class and cannot satisfy the typicality requirement. A central tenant of false advertising law is that challenged representations must be considered not only on their own, but also in the "context of the packaging as a whole." *In re Ferrero Litig.*, 794 F. Supp. 2d 1107, 1116 (S.D. Cal. 2011). Here, however, Plaintiff testified that she did not read the instructions prior to purchase. While she purported to read the instructions after purchase and prior to her use, she claims she neglected to read all the instructions, including the mixing instructions where the lower dilution level was explained. *See, e.g.*, Ex. 45 at 133:18–136:9 ("I didn't read the last line. I may have glanced at it. I don't remember reading it.").[13] Plaintiff's purchasing experience is not the same or even similar to many consumers in the putative class, who would have read all relevant instructions, and she cannot satisfy the typicality requirement. *See, e.g.*, *Minkler v. Kramer Labs., Inc.*, 2013 WL 3185552, at *4 (C.D. Cal. Mar. 1, 2013) (Walter, J.) (finding Plaintiff was not typical, in part, because "Plaintiff admits that in making his purchase decision he ignored every aspect of the [product] packaging except for the images that he claims are deceptive").

### 2. Plaintiff Has No Standing to Bring Claims for Products She Did Not Purchase

Plaintiff brings claims against two different products: Super Concentrate and Concentrate Plus, but only purchased Super Concentrate, arguing that this fact does not

---

[13] Plaintiff also erroneously believed that she could not open the pamphlet at the store because she thought she had to pay for it first, which further makes her claims atypical. Plaintiff testified that she did not read other information on the product that clearly referred to a "re-sealable label for directions and precautions," the directions to "open" the back label, and a separate direction that said to "Open booklet for details." Ex. 45 at 129:9–130:16; Ex. 1 at MM9727, MM9731 (images of the statements on the label). Plaintiff even admitted this understanding may not be typical of her putative class. Ex. 45 at 176:04–08 ("Q. You would agree with me that it's possible some consumers might understand they could open the instruction pamphlet before they purchase RoundUp concentrates? A. Maybe, yes."). Plaintiff also stated in her complaint that the pamphlet is easily torn (Dkt. 19 at 8), yet at her deposition, Plaintiff was able to remove, open, flip through, and reattach the pamphlet with ease and without damage (Ex. 46 (video)).

defeat her ability to demonstrate typicality because the "misrepresentation was the same" and product differences are "immaterial." Dkt. 51-1 at 12–13. Because the products at issue are concentrated, they are not a "one-size-fits-all" product; the significant difference between the two products are "material" in terms of whether the statement is misleading. Concentrate Plus contains 18% glyphosate, while Super Concentrate contains 50.2% glyphosate. Dkt. 35 at 23 (citing Dkt. 1 ¶¶ 37, 39). Concentrate Plus also contains an additional active ingredient, diquat diromide (Dkt. 26-3 at 3), while Super Concentrate does not (Dkt. 26-2 at 3). Plaintiff also admits that for Concentrate Plus, the instructions for higher and lower dilution levels are different. Dkt. 35 at 2. Significantly, Super Concentrate can be used around fruits and vegetables (the purpose for which Plaintiff purchased the product) (Dkt. 26-2 at 5), while Concentrate Plus warns that it is not supposed to be used in conjunction with edibles (Dkt. 26-3 at 4).[14] Plaintiff admits that she never used Concentrate Plus, does not recall if it was on the shelf when she bought Super Concentrate, never read the label on Concentrate Plus, does not know what Concentrate Plus's active ingredients are, does not know what Concentrate Plus can be used for, does not know that Concentrate Plus cannot be used around edibles, does not know what the mix rates are for Concentrate

---

[14] The cases cited by Plaintiff are inapposite. *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231 (N.D. Cal. 2014) and *Todd v. Tempur-Sealy Int'l., Inc.*, 2016 WL 5746364 (N.D. Cal. Sept. 30, 2016) stand for the proposition that minor flavor or model variations in the same product do not defeat typicality. Concentrates are not different "flavors" or "variations of the same product"—rather, they have different key ingredients and serve different functions for different consumers. Plaintiff also cites *Brown v. Hain Celestial Grp., Inc.*, 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014), where the court found that the differences between products was "irrelevant" because the plaintiffs' core claim regarding the false "organic" labeling was the same across all products without regard to their "recipes, uses, and additional virtues." *Brown*, 2014 WL 6483216 at *14. Here, however, Plaintiff's allegation concerns the dilution of Monsanto's products for effective use. The differences in composition, active ingredients, mix rates, and use between Super Concentrate and Concentrate Plus are therefore far from "irrelevant" but go instead to the heart of Plaintiff's claims.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 5:16-CV-02168

Plus, and does not know how the Concentrate Plus products are advertised or priced. Ex. 45 at 118:9–121:18. In similar situations, courts have held that the typicality requirement has not been satisfied.[15]

### D.   Plaintiff Is An Inadequate Class Representative

"The final hurdle interposed by Rule 23(a) is that 'the representative parties will fairly and adequately protect the interests of the class.'" *Hanlon v. Chrysler Corp.*, 150 F.3d. 1011, 1020 (9th Cir. 1998). Plaintiff cannot meet this prong either, for several reasons.[16]

*First*, Plaintiff seeks less in damages than the purported class members could receive outside of a class litigation through a full refund. Monsanto states its refund policy directly on its label: "If for any reason you are not satisfied after using this product, simply send us original proof of purchase and we will replace the product or refund the purchase price." Ex. 1 at MM9729.  This means that any consumer, if she believes that she was misled by a label, or unsatisfied with the product in any way, could get her full purchase price back. Plaintiff, on the other hand, is seeking for class members, only "***half*** the purchase price of the product." Ex. 45 at 162:1–6 (emphasis added.) Seeking less than is available to others makes her inadequate. *See, e.g.*, *Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 648 (C.D. Cal. 2014) ("[T]he fact that Plaintiff only asks for a 36% refund, less than is available to putative class members, makes him

---

[15] *See, e.g.*, *Wiener v. Dannon Co., Inc*., 255 F.R.D. 658, 666 (C.D. Cal. 2009) (holding that "different products have different functions and different consumers" and therefore "a named plaintiff that purchased a different product than that purchased by unnamed plaintiffs fails to satisfy the typicality requirement of Rule 23(a)(3)"); *Major v. Ocean Spray Cranberries, Inc.*, 2013 WL 2558125 *3 (N.D. Cal. Jun. 10, 2013) (class certification denied where plaintiff purchased only some of the products that were the subject of the lawsuit); *Gonzalez v. Proctor and Gamble Co.*, 247 F.R.D. 616, 621 (S.D. Cal. 2007) (class certification denied where plaintiff bought a different type of hair product from the list of products in the complaint).

[16] Monsanto does not contest the adequacy of putative class counsel.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 5:16-CV-02168

an inadequate class representative.").[17]

*Second*, Plaintiff would not be an adequate representative because certain consumers purchased the products specifically for easy-to-kill weeds (or for grasses), and thus would not only have derived benefits from the products, but also would have mixed and used the products at the lower dilution rate, making the upper bound of solution amount. *See Minkler*, 2013 WL 3185552, at *5 ("Plaintiff has admitted that he does not 'speak to' those members of the class for whom the product was effective.").[18]

*Third*, "[t]he honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry 'because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims.'" *Nghiem v. Dick's Sporting Goods, Inc.*, 2016 WL 8202696, at *6 (C.D. Cal. Dec. 1, 2016).[19] Here, there are serious credibility issues going to the very heart of the issues before the court: Plaintiff's understanding of the "Makes Up To X Gallons," her reliance on the statement and whether she actually was misled. In her Amended Complaint, and in a declaration submitted in support of the instant motion, Plaintiff stated that she purchased a 35.2-ounce bottle of Super Concentrate (Ex. 50 ¶ 3), "diluted the product according to the

---

[17] Moreover, even if Plaintiff was seeking a full refund for the class in this litigation, she still would not be an adequate representative because she is "pursuing a remedy that is already available through a costly, drawn-out, and unnecessary class action lawsuit." *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 488 (S.D. Cal. 2013).

[18] Plaintiff's lack of experience with Concentrate Plus also means she cannot adequately represent the interests of those who purchased Concentrate Plus. *Minkler*, 2013 WL 3185552, at *5 ("Plaintiff would not be an adequate representative because he had extremely limited experience with Fungi–Nail—he only used one container of the Pen Applicator version of the product—and many members of the Class are repeat purchasers of Fungi–Nail, including the 1 oz. bottle version of the product, which Plaintiff has never purchased and which has been on the market longer and has greater sales than the Pen Applicator.").

[19] *Jovel v. Boiron, Inc.*, 2014 WL 1027874, at *3 (C.D. Cal. Feb. 27, 2014) ("[W]here a representative plaintiff lacks credibility on a matter critical to the litigation, courts have denied motions for class certification based on inadequate representation.").

instructions prominently displayed on the front page of the pamphlet taped to the back panel of the product's label," (Dkt. 19 ¶ 35), and believed based upon the "Makes Up to X Gallons" neck label that the product would make 23 gallons (Ex. 50 ¶¶ 5, 7). Plaintiff further declared under oath that following the directions on the outside of the bottle, the one bottle only made "about 14 gallons." Ex. 50 ¶ 6.[20]

Yet when asked at her deposition, Plaintiff described in great detail a process she used in 2014, 2015, *and* 2016 to make ***20 gallons*** of spray solution from the 35.2-oz Super Concentrate bottle, which she testified was mixed at the higher concentration level.[21] When pressed to explain how that was possible given her underlying allegations that the bottle mixed at the higher concentration made ***14 gallons*** instead of the "Up to 23 Gallons" on the neck label, Plaintiff then altered her testimony describing a different process that resulted in not 20 gallons, but rather 10 gallons at the higher concentration level, and then 5 gallons at lower concentration level. Ex. 45 at 87:2–89:21.[22] This

---

[20] Many courts have found that credibility concerns also weigh against finding typicality. *E.g.*, *Weidenhamer v. Expedia, Inc.*, 2015 WL 7157282, at *20 (W.D. Wash. Nov. 13, 2015) ("Additionally, credibility concerns may render a named plaintiff atypical if those issues threaten to preoccupy the litigation. The Court is somewhat concerned about Plaintiff's credibility given that although he testified he read [certain instructions] 'exactly,' he apparently skipped [another step].").

[21] Plaintiff described a process where she annually purchased a single 35.2 oz. bottle (with a neck label stating "Makes Up to 23 Gallons") of Super Concentrate to use over her vegetable garden each January/February to "burn down" the weeds before planting through a two-phase process. Ex. 45 at 78:22–79:23, 81:22–89:21. *Phase 1*: using a five-gallon container she created two batches of Super Concentrate mixed at the higher dilution level to make 10 gallons of solution and then filled a 1-gallon tank sprayer 10 times to spray the weeds. *Id.* at 82:4–22; 86:11–87:1. *Phase 2*: using the same five-gallon container, she repeated the process, making another 10 gallons and then filling a 1-gallon tank sprayer 10 times to spray weeds a few weeks later. *Id.* at 82:4–6, 83:20–84:3. She testified she repeated this process in 2014, 2015, and 2016. *Id.* at 83:20–84:14. She also testified she would make the mix at the higher concentration level. *Id. at* 84:12–14. A video clip of this testimony is included as Ex. 47.

[22] This testimony is contrary to Plaintiff's sworn declaration that she only mixed Super Concentrate at the higher concentration level. Ex. 50 ¶ 7. It is also contrary to Plaintiff's

inconsistent testimony as to the central issue in the complaint undermines to Plaintiff's veracity as to her alleged "confusion" and "reliance" on the statement at issue, as well as her allegation that a reasonable consumer would not understand that the product could be mixed at differing concentration levels or "discern when it would be appropriate to use less concentrate."[23]

## II.   PLAINTIFF HAS FAILED TO MEET THE REQUIREMENTS OF RULE 23(B)(3)

Class certification is further precluded under Rule 23(b)(3) because individual issues predominate and a class action is not superior to other available methods to resolve Plaintiff's claims.

### A.    Individualized Inquiries of Materiality and Reliance Predominate

"[T]o meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole predominate over those issues that are subject only to individualized proof." *Minkler*, 2013 WL 3185552, at *5 (citation omitted). "A Rule 23(b)(3) action is inappropriate where 'the main issues in a case require the separate adjudication of each class member's individual claim or defense.'" *Id.* (citing *Zinser*, 253 F.3d at 1189).

---

allegation—and entire theme of her case—that she (and others) believed there was only one mix rate, and hence one quantity of total product per bottle, based on the labeling.
[23] Plaintiff has made several other misrepresentations. For instance, in her declaration she stated that "I and my partner used the Super Concentrate along our sidewalk and driveway, and to kill weeds that came up through the cement and on our patio." Ex. 50 ¶ 7. Yet, in her deposition, Plaintiff testified that her partner did not do any work with Super Concentrate: "I do all the garden work." Ex. 45 at 89:22–90:6. Plaintiff also stated in her declaration that "I also reviewed the demand letter that my counsel sent to Monsanto on my behalf." Ex. 50 ¶ 12. Yet, in her deposition Plaintiff testified to just the opposite. Ex. 45 at 157:5–7 ("Q. Were you aware a written demand had been made to Monsanto on or about October 6, 2016? A. Not that I recall.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14

Plaintiff here assumes away her obligation to establish predominance, arguing that she only need establish: (i) for her warranty claims, "whether its gallon statement was an express warranty and, if so, whether the Concentrates conformed to Monsanto's promises," Dkt. 51-1 at 15; and (ii) for her consumer fraud claims, whether the representation was likely to deceive under an objective "reasonable consumer" test. *Id*. at 16. Plaintiff's assertions as to her burden, however, apply only where the statement at issue is "material"—something she has failed to show.[24] "[I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *Algarin*, 300 F.R.D. at 453.[25] Moreover, "[i]f the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified." *Astiana*, 291 F.R.D. at 508.[26] As one Court stated:

15
16
17
18

[24] Whether a statement is materially misleading applies to both Plaintiff's consumer fraud claims and warranty claims. *See, e.g.*, *Astiana v. Kashi Co.*, 291 F.R.D. 493, 509 (S.D. Cal. 2013) ("Because Plaintiffs make an insufficient showing that the 'All Natural' representation is materially misleading, it is fatally unclear whether, from the perspective of the putative class, Defendant breached any express warranty or was unjustly enriched.").

19
20
21
22
23
24
25
26

[25] Plaintiff's repeated assertion that materiality is established because "a single deceptive representation" is at issue (*see, e.g.*, Dkt. 51-1 at 1) is of no moment as "[e]ven if the challenged statements were facially uniform, consumers' understanding of those representations would not be." *Jones v. ConAgra Foods, Inc*., 2014 WL 2702726, at *17 (N.D. Cal. June 13, 2014); *see also Johnson v. Harley–Davidson Motor Co. Grp., LLC*, 285 F.R.D. 573, 581 (E.D. Cal. 2012) (materiality not subject to common proof where defendants offer persuasive evidence that there are numerous individualized issues as to whether the reasonable consumer would find the misconduct complained of material); *Webb v. Carter's Inc*., 272 F.R.D. 489, 503 (C.D. Cal. 2011) (elements of materiality and reliance not subject to common proof where defendants put forth evidence that they would vary consumer-to-consumer).

27
28

[26] Plaintiff argues that reliance is not an element of a breach of express warranty claim under California law. Dkt. 51-1 at 15. That, however, is still an open question. Indeed, as recently as four days before Plaintiff filed her Motion to Certify, this Court held that

15

> There are innumerable variations in the experiences and information possessed by consumers, in the factors that influence consumers' purchasing decisions, and in the manner by which consumers react to product warnings and the disclosure of safety information. . . . people, like Plaintiff, who bought the [product] because of its price, size, and other characteristics; and many others for whom the 'warning' would have made no difference in their purchase decision.

*Sanchez v. Wal Mart Stores, Inc.*, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009).[27]

Here, like in *Sanchez*, there are numerous reasons why people buy Concentrates well beyond the "Makes Up to X Gallons" statement. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ Ex. 39 at MM3743; Guard Decl. ¶ 48 (noting factors to include

---

"Under California law a claim for breach of express warranty requires a showing of 'the exact terms of the warranty, ***plaintiff's reasonable reliance thereon***, and a breach of that warranty which proximately causes plaintiff injury." *Sonner v. Schwabe N.A., Inc.*, 2017 WL 474106, at *8 (C.D. Ca. Feb. 2, 2017) (emphasis added).  There is no dispute that reliance is an element of Plaintiff's consumer fraud counts.

[27] *See also Jones*, 2014 WL 2702726, at *16 ("Here, although only two challenged label statements are at issue, there are numerous reasons a customer might buy Hunt's tomatoes, and there is a lack of evidence demonstrating the impact of the challenged label statements. Accordingly, Plaintiffs lack common proof of materiality."); *In re Hain Celestial Seasonings Prod. Consumer Litig.*, 2015 WL 12001273, at *8 (C.D. Cal. Sept. 23, 2015) (holding that while the claim at issue may be material to some customers, "testimony does not demonstrate that it is necessarily material to reasonable consumers"); *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 631–32 (2010) ("Perhaps the majority of class members who purchased Listerine during the pertinent six-month period did so not because of any exposure to Pfizer's allegedly deceptive conduct, but rather, because they were brand-loyal customers or for other reasons."); *Hodes v. Van's Int'l Foods*, 2009 WL 2424214, at *4 (C.D. Cal. July 23, 2009) ("Courts in the Ninth Circuit and in California have regularly found that where [individualized purchasing] inquiries predominate over common questions of law or fact, courts may refuse to certify a class action.").

price, coverage, brand, kill speed, rainproof, active ingredients, discounting, packaging). Included in this myriad of reasons is "How many gallons of product you can make," but it is certainly not the sole (nor the primary) reason that consumers purchase Concentrates. *Id*.[28]

Separately, there are several key statements on the product. Plaintiff has not—and cannot—show which statements individual consumers saw and which affected their purchasing decision. Plaintiff testified that she read and relied on the "Makes Up to" claim on the neck label and combined that claim with a dilution rate on both the back label's instruction on the wheel graphic and in the back label's pamphlet. *E.g.*, Ex. 45 at 117:7–14; *id.* at 125:20–126:8; 129:2–11; *id.* at 134:10–136:9; Ex. 50 ¶¶ 7, 8. Thus, Plaintiff's own experience combined three separate statements, all on different parts of the product. Plaintiff has not shown, nor can she, that all class members saw all of and only these three statements, let alone did not understand them, when deciding whether to purchase the products. *Cf. Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) ("And while Honda might have been more elaborate and diligent in disclosing the limitations of the CMBS system, its advertising materials do not deny that limitations exist. A presumption of reliance does not arise when class members were exposed to quite disparate information from various representatives of the defendant.").[29]

---

[28] Plaintiff even admitted that one of the reasons she bought Super Concentrate was the Roundup brand name: "I trust Roundup." Ex. 45 at 122:8.

[29] There are also other factors that might impact choice beyond the product's attributes. Roundup has a website and a consumer hotline, both of which are displayed on the product, and are easily searchable online. Ex. 1 at MM9731; *see also* Exs. 32, 33. Through both mediums, Monsanto explains the different dilution rates for its Concentrate products. *Id.* There are also independent websites, some of which Plaintiff herself produced (but claims she never viewed), that describe different ways to use the products. Exs. 34, 35, 36, 37. Additionally, many stores that carry the products have lawn-and-garden specialists who are experienced with the products and might have explained the dilution rates or recommended particular products. *Compare* Guard Decl

17

Even assuming a consumer purchased the Concentrates, in whole or in part, because of the "Makes Up To X Gallons" neck label, Plaintiff has also not established that the entire class would understand the statement "Makes Up to X Gallons" to mean that the Concentrates would only "make X gallons," and no less.[30] This would be subject to numerous individualized inquires. Did the consumer, for example, read the mixing instructions, understand there was more than one dilution level, understand the gallons made was dependent upon the dilution level, and realize that the level of concentration may vary depending upon the type and age of the target weed?[31] Perhaps the consumer purchased the product not to use on any weeds but solely on grasses. Here, again, Plaintiff herself is the best evidence that consumer reliance varies, given that she read only part of the instructions and, depending on which version of her testimony or declaration is considered, followed or did not follow the directions. *See supra* n. 21.[32]

---

¶ 49 (stating many stores have specialists who help consumers), *with* Ex. 45 123:17–19, 146:19–21 (Plaintiff testifying she never talked to a store representative or specialist either the first time she bought it or subsequent times), *and Moheb*, 2012 WL 6951904, at *4 (refusing to certify a class, in part, because "some of the class members may have relied on the recommendations of [specialists], reviews, articles, or retailers' sales pitches, and, thus, Defendant's statements . . . were of no importance to them.").

[30] Courts have held that such language does not mean that the product would necessarily always make the amount stated. *See, e.g.*, *Faistl v. Energy Plus Holdings, LLC*, 2012 WL 3835815, at *4 (D.N.J. Sept. 4, 2012) ("[T]he phrase 'save up to 10' does not, without more, guarantee any particular percentage of savings, particularly when read in conjunction [with other clarifying information]."); *Maloney v. Verizon Internet Servs., Inc.*, 413 F. App'x 997, 999 (9th Cir. 2011) ("A reasonable consumer would not have been deceived by Defendants' statements, **which included the qualifier 'up to' (meaning the same or less than)**." (emphasis added)).

[31] If some putative class members bought the product specifically to use for easy-to-kill weeds, grasses, or seedlings, then their purpose, rationale, injury, materiality, and reliance would all differ from those who purchased the product for its "best use" and corresponding dilution rate. Such consumers, even according to Plaintiff's theory, would have realized the full benefit of the product.

[32] Yet another issue that requires questions of individual class members is whether they knew of or attempted to obtain a refund. If consumers were in fact dissatisfied and obtained a refund, then they lack standing. *McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,

18

Here, the evidence shows that a substantial number of consumers did not intend to use the Concentrates at only one specific dilution level, as Plaintiff alleges, but rather to use it at both stronger and weaker dilution rates. *See, e.g.*, Ex. 40 at MM3861 ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████[33] Such users could not, therefore, have relied on the "Makes Up to X Gallons" to confer a single dilution rate as Plaintiff maintains and, thus, there is no common question of reliance. *See Algarin*, 300 F.R.D. at 457 (holding that there were not common questions of reliance, in light of the objective evidence showing that there was a substantial number of class members who were not misled by the up-to-24-hour claim: "Instead, purchasers had a variety of duration expectations. Indeed, more purchasers expected the product to last less than 24 hours or had no specific duration expectations.").[34]

---

2015 WL 4537957, at *11 (N.D. Cal. July 27, 2015) ("The refund negates any claimed injury.") Here, Plaintiff's proposed class includes those who received a refund, and is therefore overbroad because those consumers have not suffered any damages. *See Turcios v. Carma Labs, Inc.*, 296 F.R.D. 638, 645 (C.D. Cal. 2014) (finding class was overbroad "because it would include consumers who already received refunds and, therefore, have not suffered any damages").

[33] *See also* Ex. 39 at MM3742 ███████████████

████████████████████████████ ; Ex. 34 at Martin 21 ("This version of Roundup —the concentrate—is very versatile as it can be mixed to any strength for any purpose. I use it to kill autumn olive which takes a concentrated dose. And I use it to kill minor weeds at a much less concentrated dose.").

[34] ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

19

Any of these questions as to materiality or reliance would "require the separate adjudication of each class member's individual claim or defense," making certification under Rule 23(b)(3) "inappropriate." *Zinser v. Accuflix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001); *see also Hodes v. Van's Int'l Foods*, 2009 WL 2424214, at *4 (C.D. Cal. July 23, 2009) ("Courts in the Ninth Circuit and in California have regularly found that where [individualized purchasing] inquiries predominate over common questions of law or fact, courts may refuse to certify a class action"); *Minkler*, 2013 WL 3185552, at *6 ("Accordingly, Plaintiff will not be able to demonstrate, as he must to prevail on his claims, that Defendants made misrepresentations to every member of the Class, that every member of the Class exposed to the alleged misrepresentations were ignorant of the truth, that every member of the Class reasonably relied on the alleged misrepresentations . . . .").

### B.  Damages Are Not Capable of Measurement on a Classwide Basis

Plaintiff's proposed method of calculating damages cannot withstand the "rigorous analysis" required for establishing predominance. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). A plaintiff can satisfy Rule 23(b)(3)'s "predominance" requirement "only if there is evidence demonstrating the existence of a classwide method of awarding relief that is consistent with the plaintiffs' legal theory." *Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, at *12 (N.D. Cal. Jan. 7, 2014).

### 1.  Plaintiff Wrongly Conflates "Benefit-of-the-Bargain" with Out-of-Pocket Losses

Plaintiff herself recognizes California law unequivocally "does not permit the recovery of benefit-of-the-bargain damages for fraud or for violations of the UCL." *Vaccarino v. Midland Nat. Life Ins. Co.*, 2014 WL 572365, at *9 (C.D. Cal. Feb. 3, 2014). Instead, damages for these causes of action are measured on an "out-of-pocket" basis—*i.e.*, the "difference between the actual value of that with which the defrauded person parted and the actual value of that which he received." Cal. Civ. Code § 3343(a);

Dkt. 51-1 at 21 (recognizing that UCL, FAL, and CLRA claims provide for out-of-pocket damages).[35]

Despite this clear law, Plaintiff's damage expert (Colin Weir) has put forth a single "Benefit-of the-Bargain" damages theory on a class-wide basis for the alleged warranty claims. Dkt. 51-16, Weir Decl. [36]  Without any economic or legal support, Weir opines that his measure of damages for the "benefit-of the-bargain" is the same measure for Plaintiff's consumer fraud claims. But as explained by Dr. Cantor, "Mr. Weir has not presented any 'framework' or calculation based on Plaintiff's out of pocket costs." Cantor Decl. ¶ 32. Instead, Weir attempted to "calculate the portion of the retail price attributable to the portion of the Product that was promised but not delivered." Weir Decl. at 2.[37] This is simply not a measure of out-of-pocket damages. A model that "focuses entirely on the difference between what plaintiffs' claim they should have received and what they actually received" cannot "purport to show that the [products] are worth less than what plaintiffs' paid for them." *Vaccarino*, 2014 WL 572365, at

---

[35] *See also Christiansen v. Roddy*, 186 Cal. App. 3d 780, 790 (1986) ("The proper measure of tort damages is the 'out-of-pocket' measure; successful tort plaintiffs are *not* entitled to have damages computed on a contract, or 'benefit-of-the-bargain,' theory." (emphasis added)).

[36] Mr. Weir only spent 15 to 23 hours on this entire retention. He only reviewed "a very small fraction" of Monsanto's deposition of the exhibits thereto.  He did not consider the Plaintiff's declaration. He only "skimmed" parts of the 11,000 pages produced by Monsanto. Ex. 48. at 45–57, 64.

[37] Perhaps aware of this fatal weakness, Plaintiff argues in her motion that Weir's model also measures out-of-pocket damages because it measures the "amount the products were under-filled, and this calculation determines market value." Dkt. 51-1 at 24. But even Weir admits this is incorrect. He went out of his way to explain the product's value was irrelevant to his calculations, because his model only measures the difference between what was promised and received, and not the actual value of the good purchased. *See, e.g.*, Ex. 48 at 109:18–22 ("So, you know, if you go talk to a car salesman and he says, I'll tell you what I'll sell you a Bentley for $10,000 and he delivers you a Toyota Corolla, *the problem is that he promised you a Bentley not that the Corolla wasn't wor[th] the $10,000*." (emphasis added)); *see also id.* at 122:10–130:25.

21

*10. And without Weir's opinion, Plaintiff has **no** evidence of out-of-pocket damages. Thus, "Plaintiff has failed to offer any evidence, let alone expert testimony, that damages can be calculated based on the difference between the market price and true value of the products. Without such evidence, Plaintiff has failed to satisfy her burden of proving that damages may be proven on a classwide basis." *Caldera v. J.M. Smucker Co.*, 2014 WL 1477400, at *3 (C.D. Cal. Apr. 15, 2014).[38]

### 2. Weir's Benefit-Of-The Bargain Model And Calculations Are Fatally Flawed

Weir's model also fails to establish that damages can be proven on a classwide basis, regardless of whether they are classified as benefit-of-the-bargain or out-of-pocket. To establish predominance, Plaintiff "must present evidence of a damages methodology that can determine the price premium attributable to [Defendant's] use of the misleading advertisements and product labeling omissions." *In re NJOY, Inc. Consumer Class Action Litig.*, 2016 WL 787415, at *5 (C.D. Cal. Feb. 2, 2016) (Walter, J.). Or stated conversely, Plaintiff must present evidence of a methodology that can show what the "true market price" of the Roundup products would be without the "makes up to" label. *See Lanovaz v. Twinings N. Am., Inc.*, 2014 WL 1652338, at *6 (N.D. Cal. Apr. 24, 2014) (holding that "benefit of the bargain method [was] not a legally sufficient method of calculating damages" because it had "no way of linking the price difference, if any, to the . . . label or controlling for other" differences in price).

Again, Weir's own testimony shows that his model does not provide the requisite methodology. Weir repeatedly emphasized that he did not even try to calculate a "price premium," and made no effort to control for the effects of "any other attributes of the product" on pricing, such as other labels, advertising, branding, competitive pricing,

---

[38] Plaintiff would also seek damages for those consumers that received a complete refund, which would result in a windfall to persons who were not damaged.

increased demand, or any other factors. Ex. 48 at 178:8–181:10.[39]

At best, Weir's model presumes that the true market price of the products can be calculated by discounting the average retail price by the percentage of "under fill." *Id.* at 110:25–111:4 (agreeing that his analysis "assumes that the amount of the supposed "under fill" is directly proportional to the amount of damages"). But Weir has proffered no evidence or literature to support his assumption that the market price of the Concentrates is a direct function of the number of gallons made. Cantor Decl. ¶ 36 ("Mr. Weir's analysis, however, makes no attempt to measure this alleged loss in value associated with the Up to Claim, and he has proposed no reliable methodologies to do so.").[40] This falls far short of the economic analysis needed to establish the existence of a "price premium" paid classwide. *See In re POM Wonderful LLC*, 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014) (holding plaintiff failed under *Comcast* when its expert "assumed that 100% of [the] price difference was attributable to [defendant's] alleged misrepresentations"); *Philips v. Ford Motor Co.*, 2016 WL 7428810, at *21 (N.D. Cal. Dec. 22, 2016) (holding predominance was not satisfied because expert's "calculation of damages relie[d] on the assumption that the true value of the [product] was $0" but "never even state[d], let alone justifie[d], . . . that this assumption is correct.").

Weir's analysis is especially deficient in light of his complete disregard of evidence of the true market value of the Concentrates—the sales data of the product without the "Makes Up to X Gallons" sticker. *See* Ex. 48 at 105–112 ("does not impact

---

[39]*See also id.* at 106:24–107:11 (explaining that "the price before and after the neck label was put on the bottle . . . does not impact the damages model because what's at issue here is the promise, the ten gallon promise or the 30 gallon promise"); *id.* at 175:10–176:23 (explaining that he did not "attempt any analysis or look at any data" regarding the label's effect on pricing).

[40] In contrast, Dr. Cantor's analysis shows that "the purchase decisions of proposed class members were driven by a variety of factors independent of the 'Up to Claim', and therefore the extent to which the 'Up to Claim' was important to any particular class member can only be ascertained through individual inquiry." Cantor Decl. ¶ 22.

the damages model"). Even a cursory evaluation of this data reveals the commercial reality that removal of the "up to" label has little to no impact on the average sales price of Concentrates. *See* Cantor Decl. ¶ 39 ("[T]here are no consistent patterns across the categories and in some cases the price change is not even in the direction suggested by Plaintiff's theory."). This illustrates that Weir's model cannot adequately control for the role that other product attributes play in pricing. *See In re NJOY*, 2016 WL 787415, at *6 (rejecting expert methodology that "completely ignore[d]" "other factors in a functioning marketplace").[41] Weir, in fact, made no effort to develop a methodology that would discount that consumers of Concentrate purchased the product for reasons having nothing to do with the "Makes Up to X Gallons" sticker.

Weir's methodology also fails to account for whether and how consumers actually used the product, simply assuming that all consumers are entitled to compensation for the full "under-fill" amount. His "one-size-fits-all" approach, therefore, has no means to either identify or determine how to calculate damages under the following circumstances: (i) a consumer that understood and purchased the product to use at the lower concentration level; (ii) a consumer that purchased the product but has not yet used all of the product; (iii) a consumer that received the full consumer satisfaction guarantee; or (iv) a consumer that may intentionally have used a portion of the product at the higher level and another portion of the product at a lower concentration level.

### C.     A Class Action is Not Superior to Other Available Methods for the Fair and Efficient Adjudication of the Dispute

---

[41] *See, e.g.*, *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *20 (N.D. Cal. June 13, 2014) (reasoning that the "benefit of the bargain approach" is "deeply flawed" because "one cannot assume that the entire price difference" between two products is purely "attributable to the alleged misstatements"); *Astiana*, 2014 WL 60097, at *12 ("Plaintiff has not offered any expert testimony demonstrating that the market price of [the product] with the 'all natural' designation was higher than the market price of [the product] without the 'all natural' designation.").

24

On every Concentrate label is Monsanto's product guarantee for a *full refund* for any reason.[42] Courts have held that when companies have such a refund policy, "a class action is not 'superior' within the meaning of [Rule] 23(b)(3)." *Webb v. Carter's Inc.*, 272 F.R.D. 489, 505 (C.D. Cal. 2011); *see also id.* at 504–05 (collecting cases where refunds made class actions inferior); *Turcios*, 296 F.R.D. at 648–49 ("The superiority requirement is not met where it makes little sense to certify a class where a class mechanism is unnecessary to afford the class members redress."). As the Court stated in *Webb*, to allow class certification in these circumstances "would merely serve to create lawsuits where none previously existed." 272 F.R.D. at 505.

## <u>CONCLUSION</u>

For the foregoing reasons, Monsanto respectfully requests that this Court deny Plaintiff's Motion for Class Certification.

Dated: February 20, 2017          **WINSTON & STRAWN LLP**

By: */s/ Stephen R. Smerek*
Stephen R. Smerek
George C. Lombardi
John J. Rosenthal
Adam S. Nadelhaft

*Attorneys for Defendant*
MONSANTO COMPANY

---

[42] Indeed, Monsanto, through Scotts, gave a full refund to the consumer, Eugene, who Plaintiff paraded as an example of a person who complained about Monsanto's label (Dkt. 51-1 at 7)—even without a proof of purchase. Ex. 44 at MM1193.

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I hereby certify that on February 20, 2017, I served the foregoing on counsel of

3

record for plaintiff, by regular and electronic mail as follows:

4

5

**THE LAW OFFICE OF JACK FITZGERALD, PC**

6

JACK FITZGERALD (SBN 257370)
jack@jackfitzgeraldlaw.com

7

Hillcrest Professional Building

8

3636 Fourth Avenue, Suite 202
San Diego, California 92103

9

Phone: (619) 692-3840

10

Fax: (619) 362-9555

11

**JACKSON & FOSTER, LLC**

12

SIDNEY W. JACKSON, III
75 St. Michael Street

13

Mobile, Alabama 36602

14

Phone: (251) 433-6699
Fax: (251) 433-6127

15

16

By: */s/ Stephen Smerek*
Stephen Smerek

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 5:16-CV-02168